1
2
3
4
5
6
7

8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10   JESUS ROMERO, a Minor, by and          CASE NO. 15cv815-GPC(MDD)
     through his Guardian ad Litem,
11   MERIDA RAMOS; MARCOS
     ROMERO, a Minor, by and through        **ORDER GRANTING IN PART AND**
12   his Guardian ad Litem, MERIDA          **DENYING IN PART SCHWAB**
     RAMOS; and PERLA ROMERO, a             **DEFENDANTS' MOTION FOR**
13   Minor, by and through her Guardian     **SUMMARY JUDGMENT**
     ad Litem, MERIDA RAMOS,
14
                               Plaintiff,   [Dkt. No. 80.]
15
         v.
16

17   MACY'S, INC., fka FEDERATED
     DEPARTMENT STORES, INC., a
18   Delaware corporation; RALPH
     LAUREN CORPORATION, a
19   Delaware corporation; and DOES 1
     through 50, Inclusive,
20
                              Defendant.
21

22        Before the Court is Schwab Defendants' motion for summary judgment.  (Dkt.

23   No. 80.)  Plaintiffs filed an opposition to Defendants' motion, (Dkt. No. 97), and

24   Defendants filed a reply.  (Dkt. No. 98.)  Based on the reasoning below, the Court

25   GRANTS in part and DENIES in part Schwab Defendants' motion for summary

26   judgment.

27                              **Background**

28        On April 13, 2015, the case was removed from state court.  (Dkt. No. 1.)  On

August 18, 2015, Plaintiffs filed a first amended complaint against Defendants Macy's Inc., Macy's West Stores, Inc., and Ralph Lauren Corporation's ("Macy Defendants") and added RL Childrenswear Company, LLC; S. Schwab Company, Inc.; Sylvia Company, LLC; Cuny Associates, LLC; LM Services, LLC; Samuel Schwab; Douglas Schwab; Tadd Schwab; and Amy Owens (collectively the "Schwab Defendants") as defendants.[1]  (Dkt. No. 17.)  The FAC alleges claims against Macy Defendants and Schwab Defendants for severe burns suffered by Plaintiff Jesus Romero, a minor at the time, when a shirt ("Shirt") allegedly purchased at Macy's caught fire after being exposed to a flame.  Jesus claims that the Shirt was defective because it was not 100% cotton as stated on the label and the blend of fibers in the Shirt increased the risk of severe injury.  Jesus asserts six causes of action against the designer and manufacturer of the shirt, Ralph Lauren and Schwab Defendants, and the seller, Macy's Inc. and Macy's West Stores, Inc. ("Macy's"), for manufacturing defect, design defect and failure to warn under strict products liability, negligence, breach of warranty and negligent misrepresentation.[2]

## Factual Background

### A.    The Incident

On January 30, 2005, Jesus and his family were planning to go to the beach, eat lunch and go horseback riding in Rosarito, Mexico.  (Dkt. No. 97-6, Ps' Evid., Ex. 17, Jesus Depo. at 34:10-16;  Dkt. No. 97-6, Ps' Evid, Ex. 18, Merida Depo. at 17:12-18.)

---

[1]On September 16, 2015, the Court granted Defendants' motion for leave to file a third party complaint.  (Dkt. No. 21.)  On April 28, 2016, Macy Defendants filed a third party complaint for indemnification and other causes of action against the Schwab Defendants.  (Dkt. No. 61.)

[2]Jesus' siblings, Marcos and Perla Romero, asserted a cause of action for negligent infliction of emotional distress based on a bystander theory.  (Dkt. No. 17, FAC.)  However, on October 13, 2016, the parties filed a joint motion to dismiss the claims of Marcos and Perla Romero.  (Dkt. No. 95.)

[15cv815-GPC(MDD) ]

After Jesus[3] and his younger brother, Marcos, were dressed and waiting for the excursion, they went next door to a neighbor's house to use a lighter they had previously gotten in Mexico. (Dkt. No. 97-6, Ps' Evid., Ex. 17, Jesus Depo. at 61:18-23; 37:12-25; Dkt. No. 97-6, Ps' Evid, Ex. 18, Merida Depo. at 24:3-4; Dkt. No. 80-5, Ds' Evid., Ex. 1, Jesus Depo. at 38:25-39:25; 77:16-20.) Both were sitting down and while Jesus held the flower or green weed, Marcos lit the flower or weed with the lighter. (Dkt. No. 97-6, Ps' Evid., Ex. 17, Jesus Depo. 80:25-81:12; 83:10-84:24.) Jesus testified that he let go of the flower or weed because his fingers got hot and the lit flower or weed landed on his shirt near his stomach. (Id. at 90:21-91:6; 91:25-92:5.) Jesus told his brother to go get help so Marcos ran into the house and their father came out, ripped the shirt off, dropped it to the concrete and stepped on it to extinguish the flames. (Id. at 95:17-20; 100:11-22.)

On the day of the incident, Jesus was wearing a boys' short-sleeved Ralph Lauren red-and-white gingham button-down dress shirt. (Dkt. No. 97-6, Ps' Evid., Ex. 18, Merida Depo. at 26:6-20; 77:8-17; 78:5-25; 153:2-8.) Jesus' mother, Merida, always checked the labels and bought 100% cotton clothing for her family. (Id. at 42:22-43:6; 47:4-8.) Merida testified she purchased the shirt worn by Jesus at Macy's in Chula Vista, CA in July or August 2004. (Id. at 33:4-12; 35:1-11; 52:2-9.) She would not have purchased the shirt if it had not been labeled 100% cotton. (Id. at 48:24-49:4; 49:25-50:4.)

Merida stated when she purchased the Shirt, she had her Macy's card. (Dkt. No. 97-6, Ps' Evid., Ex. 18, Merida Depo. at 54:2-5.) Macy's credit card statements from the family does not show a record for the Shirt's purchase. (Dkt. No. 80-11, Ds' Evid., Ex. 7.) When she purchased her children's clothes at Macy's, Merida would use her Macy's credit card, pay in cash or use her debit card. (Dkt. No. 97-6, Ps' Evid., Ex. 18,

---

[3]The parties do not state the ages of Jesus and his brother at the time of the incident. In the Court's prior order on summary judgment, Plaintiffs and Macy Defendants did not dispute that on the date of the incident Jesus was 7 years old and Marcos was 6 years old. (Dkt. No. 76-1, Ps' Am. Response to SSF, No. 2.)

1   Merida Depo. at 71:12-24.)

2       On May 25, 2004, a few months prior to Merida purchasing the Shirt, Ralph

3   Lauren entered into an Asset Purchase Agreement with RL Childrenswear Company,

4   LLC to reacquire its licenses back. (Dkt. No. 80-12, Ds' Evid., Ex. 8.)  While the Asset

5   Purchase Agreement was dated May 25, 2004, it had a closing date of July 2, 2004.

6   (Dkt. No. 97-6, Ps' Evid., Ex. 31, Sam Schwab Depo. at 83:9-84:16.)

7   **B.    Scientific Testing of the Shirt**

8       On December 17, 2015, the parties met at Seal Laboratories in El Segundo

9   California for all Defendants' inspection of the Shirt. (Dkt. No. 97-4, Weitz Decl. ¶ 2.)

10  In advance of the meeting, the parties agreed to an inspection and sampling protocol.

11  (Id.)  Plaintiffs' counsel brought the remnants of the burned shirt to Seal Laboratories.

12  (Id.)  It was decided that a qualified person at Seal Laboratories would cut four

13  samples of fabric from the shirt, each of roughly equal size. (Id.)  Three of the samples

14  would be distributed among the parties to perform whatever analysis and testing the

15  respective experts deemed appropriate. (Id.)  The fourth sample would be held by

16  Plaintiffs' counsel's firm and would not be subject to destructive testing unless agreed

17  to by all parties. (Id.)  It was also agreed, at the request of Schwab Defendants' experts

18  and counsel, that they could select a fifth sample to take for testing. (Id.)  The parties

19  did not make any agreements as to the methodology to be used during Defendants'

20  experts' inspection of the Shirt. (Id.)

21      Schwab Defendants' expert, Dr. David Howitt, was at Seal Laboratories for the

22  the inspection. (Dkt. No. 80-3, Howitt Decl. ¶ 8.)  The remnants of the fabric was red

23  and white Gingham style cotton material and not a raised surface fiber fabric. (Id. ¶ 9.)

24  There were no labels or tags to identify the manufacturer, serial number or the country

25  of origin of the fabric. (Id.)  Using a magnifying glass, the fabric and charred remains

26  were indicative of a simple cotton fabric. (Id. ¶ 10.)

27      The Consumer Products Safety Commission enacted regulations, 16 C.F.R. §

28

1610[4] *et seq.*, concerning apparel flammability testing requirements to prevent dangerously flammable textiles and garments from entering the stream of commerce. (Id. ¶ 11.)  Under the regulations, plain surface fabrics, regardless of fiber content, weighing 2.6 ounces per square yard or more are exempt from flammability testing and are not considered to be dangerously flammable.  (Id. ¶ 15.)

At the inspection, Dr. Erik Richman of Seal Laboratories cut portions of the shirt to be weighted and distributed to each of the parties to conduct their own testing.  (Id. ¶ 16.)  Four separate samples were cut from the least damaged portions of the shirt to determine the weight of the fabric in unit area.  (Id. ¶ 17.)  The sample fabrics weighed between 3.41 to 3.58 ounces per square yard which exceeded the 2.6 ounces per square yard minimum required for flammability testing.  (Id.)

Dr. Howitt noted that Dr. Xu's method of washing and oven drying a piece of Sample No. 2 producing an areal density between 2.51 and 2.79 ounces per square yard would signal that 28% of the weight was either excess water or a contaminant that could be removed by washing, but based on the strength of peaks in the FTIR[5] spectra, it would not suggest the presence of a large amount of moisture.  (Id.)  When Dr. Howitt oven dried Sample No. 3, conditioned and weighed it, he discerned no weight change in sample 3 and the aerial density of the fabric was still at least 3.35 ounces per square yard.  (Id.)  According to Dr. Howitt, whichever weight measurement one

---

[4] 16 C.F.R. § 1610 was promulgated under the Flammable Fabrics Act, 15 U.S.C. § 1191 *et seq.* The FFA, was enacted in 1953, and "as amended, prohibits the introduction or movement in interstate commerce of fabrics . . . which are flammable within a 'Standard' of flammability established by the Secretary of Commerce." Congoleum Indus., Inc. v. Consumer Prod. Safety Comm'n, 602 F.2d 220, 222 n.1 (9 Cir. 1979). The "Standard for Flammability of Clothing Textiles" is codified at 16 C.F.R. § 1610 whose purpose is to "reduce danger of injury and loss of life by providing, on a national basis, standard methods of testing and rating the flammability of textiles and textile products for clothing use, thereby prohibiting the use of any dangerously flammable clothing textiles." 16 C.F.R. § 1610.1.

While Plaintiffs challenge Defendants' expert conclusions of testing under the FFA, Plaintiffs also dispute that compliance with the FAA does not relieve Defendants of liability under state law negligence, warranty or products liability claims.

[5] Fourier Transform Infrared Spectroscopy.  (Dkt. No. 97-2, Xu Decl. ¶ 3.)

[15cv815-GPC(MDD) ]

wishes to adopt, the original fabric would have been exempt from flammability testing. (Id.)

Next, Schwab Defendants sent its sample of the fabric to Forensic Analytical Laboratories ("FAL"), an independent and reputable laboratory, to conduct fiber identification analysis of the shirt using polarized light microscopy ("PML") and FTIR Spectroscopy. (Id. ¶ 19.) After testing, FAL concluded that "The swatch of fabric is identified as containing 100% cotton fibers in an alternating red and white pattern." (Id. ¶ 21; Dkt. No. 80-13, Ds' Evid., Ex. 9, FAL Report.) According to Dr. Howitt, despite Dr. Xu's conclusions conducting a similar FTIR examination noting the presence of nylon, there is no evidence to suggest any nylon in any of the FTIR spectra. (Id. ¶ 21.) Dr. Howitt disputes Dr. Xu's opinion concerning the two peaks that are more pronounced on the spectrum as indicating the presence of nylon and argues that cotton fabrics often exhibit peaks at these points. (Id.)

In addition, Dr. Howitt's review of the SEM conducted by Plaintiffs' expert, Dr. David Hall, revealed no evidence of nylon fibers in the fabric; in fact, Dr. Hall's conclusion that the shirt was made of a blend of 90% cotton and at least 4-5% nylon and at least 5-6% rayon based on the SEM micrographs suggest a very different composition consisting of 60-70% cotton, 3-5% nylon and 25-35% rayon based on his coloring of the fibers. (Id. ¶ 22.)

Dr. Howitt concluded that Plaintiffs' experts opinion that 5% nylon and 6% rayon will burn more vigorously and cause more severe injuries is inaccurate; instead the key to determining why a material is burning vigorously is to focus on the strength of the ignition source and the geometrical configuration of the material. (Id. ¶¶ 24-25.)

In response, Plaintiffs present their expert, Dr. David Xu, Ph.D., to dispute the findings of Dr. Howitt. Dr. Xu determined that based on his testing, the Shirt was not 100% pure cotton. (Dkt. No. 97-2, Xu Decl. ¶ 3.) Microscopic analysis is indispensable for positive identification of rayon versus cotton fibers and distinguishing these fibers from other man-made fiber types. (Id. ¶ 6.) A Scanning

Electron Microscope ("SEM") is "capable of producing a very high-resolution, detailed images of the complete fiber surface at high magnification" and is the least destructive method to identify fiber content. (Id.) Having reviewed the SEM images of the Shirt taken by Dr. David Hall, Dr. Xu agreed with Dr. Hall's assessment that the Shirt is composed of a blend of cotton, rayon, and nylon fibers. (Id. ¶ 7.)

Then, Dr. Xu performed a multi-component FTIR and concluded the Shirt contained at least 4% nylon fibers. (Id. ¶¶ 8-14.) Dr. Xu notes that Dr. Howitt did not analyze the FTIR spectrogram for the presence of nylon. However, Macy Defendants' experts admit the Shirt contains about 5% rayon but they failed to look for nylon. (Id. ¶ 14.) The SEM and FTIR demonstrate that Shirt is composed of about 90% cotton, 4-5% nylon, and 5-6% rayon. (Id. ¶ 3.)

According to Dr. Xu, FAL's testing upon which Dr. Howitt relied upon to form his opinions concerning the fabric content of the Shirt did not conform its testing to AATCC Test Method 20A, the accepted industry standard for identifying the generic classification of common fiber types. (Id. ¶¶ 37-40.) In fact, FAL's report does not reference AATCC Test Method 20A; instead, its testing was biased towards an erroneous finding that the Shirt was 100% cotton fibers. (Id. ¶¶ 37, 38.)

Dr. Xu also measured the areal density of the Shirt using ASTM Test Method D3776. (Id. ¶ 29.) According to Xu, ASTM Test Method D3776 is the industry standard method for measuring the areal density of fabric. (Id.) Based on ASTM Test Method D3776, which requires that the fabric be conditioned prior to measuring, and measuring the fabric according to ASTM Test Method D3774, Xu calculated the weight of Sample 2 to be between 2.51 and 2.79 ounces per square yard. (Id. ¶¶ 29, 31, 34.) Dr. Xu disputes the areal density measurements calculated by Defendants' experts, Dr. Erik Richman and Dr. Howitt, as inaccurate as it does not reflect the true weight of the fabric. (Id. ¶ 36.) Based on his measurement, it cannot be said that the Shirt is exempt from the flammability testing requirements under 16 C.F.R. § 1610. (Id.)

Dr. Xu opines that the blend of nylon, rayon and cotton fibers resulted in a net cost savings to Schwab Defendants and an increased risk to Jesus. (Id. ¶¶ 15-27.) He concluded that Defendants' decision to use a blend of fibers placed Jesus at a greater risk for severe burns because rayon shrinks and adheres to a child's skin and nylon melts to the skin. (Id. ¶ 3, 24-25.) He explained that the blend of cotton, nylon and rayon made the fabric more flammable and dangerous than if the shirt were 100% cotton and increased the potential for injury. (Id. ¶ 3)

## Discussion

### A.   Legal Standard on Motion for Summary Judgment

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 327 (1986). Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material when it affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. Celotex Corp., 477 U.S. at 323. The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. Id. at 322-23. If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings

and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324. If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. Id. at 325. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party." Fontana v. Haskin, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. Anderson, 477 U.S. at 255.

Schwab Defendants move for summary judgment on all causes of action[6] because the optical, microscopy and laboratory analysis of the Shirt confirms there were no defects that rendered it dangerously flammable and there is no evidence the Defendants manufactured the Shirt. Next, they move for summary judgment as to the individual defendants, Samuel Schwab, Doug Schwab, L. Tadd Schwab and Amy Owens, because Plaintiffs failed to present facts to justify piercing the corporate veil in order to hold these defendants personally liable.

**A.    Manufacturing Defect, Breach of Implied Warranties, Design Defect, Failure to Warn and Negligence**

As a threshold issue, Schwab Defendants contend that there is no evidence that they manufactured the Shirt and Plaintiffs have not produced any documents evidencing proof of purchase of the Shirt. Jesus' mother, Merida, testified that on the day she purchased the Shirt, she had a Macy's card. (Dkt. No. 80-8, Ds' Evid., Ex. 4, Merida Depo. at 54:2-5.) However, Macy's has no record of the purchase as it

---

[6]The Court notes that while Schwab Defendants state they move on all causes of action, they have not moved for summary judgment on the claim for negligent misrepresentation. (Dkt. No. 80-1.)

produced statements which did not show the subject Ralph Lauren shirt but shows clothing by Tommy Hilfiger.  (Dkt. No. 80-11, Ds' Evid., Ex. 7, Macy's Receipts.) Moreover, on May 25, 2004, Ralph Lauren entered into an Asset Purchase Agreement with RL Childrenswear Company, LLC to reacquire its license back from RL Childrenswear.  Because Merida purchased the shirt three months after the Asset Purchase Agreement, Plaintiffs cannot show that Schwab Defendants manufactured the Shirt.  Lastly, since the remnants of the shirt were charred, there is no evidence who manufactured the shirt as there were no labels or tags.  (Dkt. No. 80-3, Howitt Decl. ¶ 9; Dkt. No. 80-10, Ds' Evid., Ex. 10, photograph of shirt.)

Plaintiffs respond by presenting facts to dispute Schwab Defendants' allegations. Merida testified that when she purchased the shirt at Macy's, while she had her Macy's card with her, she does not remember how she paid for the shirt.  (Dkt. No. 97-6, Ps' Evid., Ex. 18, Merida Depo. at 33:4-12; Dkt. No. 80-8, Ds' Evid., Ex. 4, Merida Depo. at 54:6-9.)  She stated that when she shopped at Macy's in 2004 she paid by cash, credit or debit.  (Dkt. No. 97-6, Ps' Evid., Ex. 18, Merida Depo. 71:12-24.)  In addition, Marcos was photographed wearing the Shirt, with its trademark Polo logo.  (Dkt. No. 97-5, Ps' Evid., Ex. 6.)

Furthermore, RL Childrenswear held a license from Polo Ralph Lauren to manufacture and sell Ralph Lauren brand boys 4-20 products, including woven shirts. (Dkt. No. 97-8, Ps' Evid., Ex. 32, T. Schwab Depo. at 61:24-63:3; 63:17-64:16.)  RL Childrenswear manufactured Ralph Lauren boys woven gingham style shirts like the Shirt.  (Dkt. No. 97-7, Ps' Evid., Ex. 31, Sam Schwab Depo at 84:19-85:13.)  Schwab Defendants sold the license back to Ralph Lauren in a transaction that closed on July 2, 2004.  (Id. at 83:9-84:16.)  At closing, the transition inventory already manufactured by Schwab Defendants including work in progress at factories overseas, remained to be shipped to department stores such as Macy's.  (Id. at 55:23-56:12; 88:5-89:12.) Merida purchased the Shirt during the same time period near the closing around July or August 2004.  (Dkt. No. 97-6, Ps' Evid., Ex. 18, Merida Depo. at 35:1-11.)

Therefore, Plaintiffs raise an issue of fact that the Shirt could have been manufactured by Schwab Defendants as part of existing inventory or product that would soon be shipped under the license and transition agreements.  Through Merida's testimony, Plaintiffs also create a genuine issue of fact as to whether Merida purchased the Shirt at Macy's.  In sum, Plaintiffs have presented evidence to create a genuine issue of material fact that Schwab Defendants manufactured the Shirt and that Jesus' mother purchased the Shirt at Macy's.

Next, Schwab Defendants move for summary judgment on the  manufacturing defect claim, breach of implied warranties, design defect, failure to warn and negligence[7] claims based on the opinions of their expert, Dr. Howitt, arguing that the Shirt was not defective. (Dkt. No. 80-1 at 14, 17-18.)  Plaintiffs respond by producing Dr. Xu's expert opinion raising a genuine issue of material fact as to whether the Shirt was defective and whether it was mislabeled as 100% cotton since the Shirt did not perform as expected when it burned.[8]

In the Court's prior order denying Defendants Macy and Ralph Lauren's motion for summary judgment, it found that the conflicting expert evidence presented by both parties created a genuine issue of material fact. (Dkt. No. 94 at 8-9.)  As explained in the Court's prior order on summary judgment, expert affidavits from both parties can create a genuine issue of fact that defeats summary judgment and the Ninth Circuit has cautioned against granting summary judgment where expert guidance is needed and where there are competing expert declarations. See Garter–Bare Co. v. Munsingwear,

---

[7]Schwab Defendants also argue that the negligence claim fails because Plaintiffs cannot prove who manufactured or sold the shirt.  Because the Court concludes that there are genuine issues of material fact whether Schwab Defendants manufactured the Shirt at issue, the Court also DENIES the negligence claim based on this argument.

[8]Plaintiffs filed evidentiary objections as to the declaration of Dr. Howitt. (Dkt. No. 97-9.)  Schwab Defendants also filed evidentiary objections to Dr. Xu and Dr. Ellison. (Dkt. No. 98-2.)  The Court notes the evidentiary objections.  To the extent that the evidence is proper under the Federal Rules of Evidence, the Court considered the evidence.  To the extent that the evidence is not proper, the Court did not consider it.

[15cv815-GPC(MDD) ]

Inc., 650 F.2d 975, 979-80, 982 (9th Cir. 1980) (reversing a district court's grant of summary judgment where the parties provided conflicting expert testimony and the district court granted summary judgment by relying solely on the moving party's expert testimony); DeLew v. Adamson, 293 F. App'x 504, 506 (9th Cir. Sept. 17, 2008) ("The existence of conflicting expert assessments suggests that neither party is entitled to summary judgment."); see also Ethyl Corp. v. Borden, Inc., 427 F.2d 206, 210 (3d Cir. 1970) (Courts may not resolve "disputed and relevant factual issues on conflicting affidavits of qualified experts."). "As a general rule, summary judgment is inappropriate where an expert's testimony supports the non-moving party's case." Provenz v. Miller, 102 F.3d 1478, 1490 (9th Cir. 1996) (quoting In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1425 (9th Cir. 1994)).

In this case, Schwab Defendants present Dr. Howitt's declaration and supporting exhibits to support their conclusion that the Shirt is not defective. In response, Plaintiffs present facts, through their expert, Dr. Xu, disputing Dr. Howitt's conclusion. Plaintiffs have met their burden demonstrating there are genuine issues of material fact, and the Court DENIES Defendants' motion for summary judgment on the causes of action for manufacturing defect, breach of the implied warranties, design defect, failure to warn and negligence.

**C.    Motion for Summary Judgment as to the Individually Named Defendants**

Schwab Defendants also argue that summary judgment should be granted as to the individually named Defendants, Samuel Schwab, Douglas Schwab, Tadd Schwab, and Amy Owens, because Plaintiffs have failed to allege any facts or evidence that the Court should invoke the alter ego doctrine and pierce the corporate veil. In response, Plaintiffs argue that genuine issues of material fact exist as to whether the individual Defendants are personally liable under an alter ego theory.

It is a general principal that a parent corporation and its stockholders, officers and directors will be treated as separate legal entities with separate and distinct liabilities and obligations. Sonora Diamond Corp. v. Superior Court, 83 Cal. App. 4th

[15cv815-GPC(MDD) ]

523, 538 (2000).  The corporate veil may be pierced "where an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for the actions of the corporation." <u>Sonora Diamond Corp.</u>, 83 Cal. App. 4th at 538.  "Under the alter ego doctrine, then, when the corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation, in most instances the equitable owners." <u>Id.</u> (citations omitted).

In California, two conditions must both be met in order to invoke the alter ego theory: (1) a unity of interest and ownership must exist between the corporation and its equitable owner such that there does not exist a separateness between them;[9] and (2) "there must be an inequitable result if the acts in question are treated as those of the

---

[9]Factors to consider are the following which are nonexhaustive: "[c]ommingling of funds and other assets, failure to segregate  funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses . . .; the treatment by an individual of the assets of the corporation as his own . . .; the failure to obtain authority to issue stock or to subscribe to or issue the same . . .; the holding out by an individual that he is personally liable for the debts of the corporation . . .; the failure to maintain minutes or adequate corporate records, and the confusion of the records of the separate entities . . .; the identical equitable ownership in the two entities; the identification of the equitable owners thereof with the domination and control of the two entities; identification of the directors and officers of the two entities in the responsible supervision and management; sole ownership of all of the stock in a corporation by one individual or the members of a family . . .; the use of the same office or business location; the employment of the same employees and/or attorney . . .; the failure to adequately capitalize a corporation; the total absence of corporate assets, and undercapitalization . . . ; the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation . . .; the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities . . .; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities . . .; the use of the corporate entity to procure labor, services or merchandise for another person or entity . . .; the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another . . . ; the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge of illegal transactions . . . ; and the formation and use of a corporation to transfer to it the existing liability of another person or entity . . . ." <u>Zoran Corp. v. Chen</u>, 185 Cal. App. 4th 799, 811-12, (2010).  "No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine." <u>Id.</u> at 812

corporation alone." Sonora Diamond Corp., 83 Cal. App. 4th at 538 (citations omitted). Piercing the corporate veil is an extreme remedy that should be used sparingly. Id. at 539. Plaintiff bears the burden to establish the corporate veil should be pierced. Wady v. Provident Life and Accident Ins. Co. of America, 216 F. Supp. 2d 1060, 1066 (C.D. Cal. 2002).

The alter ego doctrine prevents fraud or other misdeeds and cannot be invoked without evidence of injustice or wrongdoing. Sonora Diamond Corp., 83 Cal. App. 4th at 539. While actual fraud is not required, "bad faith in one form or another is an underlying consideration." Associated Vendors, Inc. v. Oakland Meat Co., Inc., 210 Cal. App. 2d 825, 838 (1962). Mere difficulty in enforcing a judgment or collecting a debt does not satisfy the requirement for misconduct or injustice. Sonora Diamond Corp., 83 Cal.App.4th at 537. Whether a party is liable under an alter ego theory is typically a question of fact. Leek v. Cooper, 194 Cal. App. 4th 399, 418 (2011); Zoran Corp. v. Chen, 185 Cal. App. 4th 799, 811 (2010). In Associated Vendors, the court noted that where disregarding the corporate entity was warranted, several unity of interest factors were present and supported by substantial evidence. Associated Vendors, 210 Cal. App. 2d at 840.

## 1.    Unity of Interest

Plaintiffs argue that certain factors support the unity of interest factor. Before conducting an analysis, the Court explains the role of each Schwab entity Defendant and each individually named Defendant as presented by Plaintiffs' evidence.

RL Childrenswear obtained the license from Ralph Lauren to sell its children's clothing. (Dkt. No. 97-6, Ps' Evid., Ex. 31, S. Schwab Depo. at 24:9-25.) Sylvia Company was a holding company for RL Childrenswear and its sole asset was 100 percent of the stock of RL Childrenswear. (Id. at 34:14-23.) CUNY Associates was set up to allow non-family employees to share in the profits of RL Childrenswear. (Id. at 35:20-36:16.) LM Services was the entity in which all employees were employed so employees who did work in connection with the license with Ralph Lauren received

their paychecks from LM Services. (Id. at 36:20-37:18.) LM Services contracted with RL Childrenswear for the services of LM Services' employees. (Id. at 36:24-37:3.) RL Childrenswear, Sylvia Company and CUNY Associates did not have any employees. (Id. at 37:12-14; 38:17-24.)  All the entities had the same office location in Cumberland Park, Maryland. (Id. at 41:9-14.)  Shortly after and pursuant to the Asset Purchase Agreement, RL Childrenswear, Sylvia Company, CUNY Associates, and LM Services[10] ceased doing business, and do not have any bank accounts or assets. (Dkt. No. 97-6, Ps' Evid., Ex. 31, S. Schwab Depo. at 32:11-24; 35:5-11; 36:5-6; 113:18-114:19; see also Dkt. No. 98-1, Schwab Ds' Response to Ps' Add'l SSF Nos. 140, 142, 147.)

S. Schwab Company is still a business and has assets and a bank account. (Dkt. No. 97-6, Ps' Evid., Ex. 31, S. Schwab Depo. at 113:1-21.)  Samuel Schwab is currently President of S. Schwab Company which is currently an asset holding company and no longer involved in the business of children's clothing. (Id. at 13:7-14; 21:6-17.) Today, S. Schwab Company invests its own assets and funds. (Dkt. No. 97-7, Ps' Evid., Ex. 33, Owens Depo. at 26:4-6.)  Samuel Schwab does not know if there are any other officers or directors and whether there is a board of directors for S. Schwab Company but noted there was a board of directors 15 years ago. (Dkt. No. 97-6, Ps' Evid., Ex. 31, S. Schwab Depo. at 13:15-25; 14:4-6.)

Samuel Schwab was also President of CUNY Associates, (Id. at 36:17-19.) Doug Schwab was VP of Technology for LM Services. (Id. at 43:12-15.) Tadd Schwab was the VP of Quality and Compliance for RL Childrenswear. (Dkt. No. 97-7, Ps' Evid., Ex. 32, T. Schwab Depo. at 12:6-9.) Samuel Schwab gave Tadd Schwab the title of VP of Quality and Compliance. (Id. at 19:17-18.) Amy Owens became VP of the Schwab Company. (Dkt. No. 97-7, Ps' Evid., Ex. 33, Owens Depo. at 21:4-7.) Douglas Schwab held numerous titles at S. Schwab Company such as corporate

---

[10]LM Services ceased doing business when it sold its last children's wear operating company around 2007. (Dkt. No. 97-6, Ps' Evid., Ex. 31, S. Schwab Depo. at 39:4-11.)

secretary, a systems manager, IT manager and VP of IT.  (Dkt. No. 97-7, Ps' Evid., Ex. 34, D. Schwab Depo. at 16:9-22.)  He also served as VP of RL Childrenswear and was probably the corporate secretary of Sylvia Company.  (Id. at 18:22-23; 19:7-10.)

### a. Sole ownership by an individual or members of a family;

Plaintiffs argue that the individual defendants, who are all cousins and brothers, were the primary owners, officer, member and directors of the Schwab entities.  In support, they only state that Samuel Schwab was Sylvia Company's President and was CUNY Associates' President.  (Dkt. No. 97-6, Ps' Evid., Ex. 31, S. Schwab Depo. at 35:7-11; 36:17-19.)  Defendants reply that mere ownership and leadership role in the entities' affairs is not sufficient to pierce the corporate veil.

Ownership of an interest in the corporation is a threshold question under the alter ego doctrine because if an individual's ownership is not established, the corporations' obligations cannot be imposed on him or her.  Riddle v. Leuschner, 51 Cal. 2d 574, 580 (1959) (husband, who was a managing employee held no stock so the alter ego did not apply to him despite his involvement in conduct at issue); SEC v. Hickey, 322 F.3d 1123, 1128 (9th Cir. 2003) ("[o]wnership is a prerequisite to alter ego liability").

In this case, the Court notes that in their brief, Plaintiffs have not presented evidence that the individual Defendants have an ownership interest in the corporations. In their Separate Statement of Facts, Plaintiffs refer to the individual Defendants as officers, members, or agents. (Dkt. No. 98-1, Ds' Response to Ps' Add'l SSF Nos. 134-194.)  The only alleged fact as to ownership is Douglas Schwab's testimony that he signed the Asset Purchase Agreement based on his understanding that he was a shareholder in the S. Schwab Company.  (Dkt. No. 98-1, Ds' Response to Ps' Add'l SSF No. 194 (citing Dkt. No. 97-7, Ps' Evid., Ex. 34, D. Schwab Depo. at 40:7-41:7).)  After the Court's review of the record, it came upon the fact that the shareholders of the S. Schwab Company, Inc. consisted of family members, including individually

named Defendants Amy Owens, Doug Schwab, and Tadd Schwab.[11] (Dkt. No. 97-6, Ps' Evid., Ex. 31, S. Schwab Depo. at 21:18-22:10.) This fact only applies to ownership in S. Schwab Company and not the other Schwab entity Defendants. Ownership by a members of a family supports the unity of interest factor as to S. Schwab Company and the individually named Defendants but not as to the other entity Defendants.

### b. Use of the entities as mere shells, instrumentalities, or conduits for a single venture;

Plaintiffs argue that each Schwab entity Defendant was created to serve a specific narrow purpose within the "family business" of manufacturing childrenswear under the Ralph Lauren label. For example, RL Childrenswear Company, LLC was formed for the sole purpose of holding the license to manufacture Ralph Lauren children's clothing and had no employees. LM Services, LLC, was formed and employed everyone who worked as an employee of the Schwab entities, regardless of which brand they worked on. CUNY Associates, LLC, was set up solely for the purpose of allowing non-family member employees of the Schwab Enterprise to share in the profits of the Ralph Lauren childrens clothing line. Sylvia Company was a formed solely as a holding company for RL Childrenswear, and its sole asset was 100% ownership of RL Childrenswear. Sylvia Company, like RL Childrenswear, never had any employees. Plaintiffs argue that these entities were created to insulate Schwab assets from Schwab liabilities. In reply, Schwab Defendants argue that the entities were structured to serve various and legitimate purposes concerning the childrenswear business and is a prudent business plan common to many well-known corporations.

In <u>Aliya Medicare Finance, LLC v. Nickell</u>, No. 14-7806 MMM(Ex), 2015 WL 11072180 (C.D. Cal. Sept. 25, 2015), the Court denied defendant's motion to dismiss

---

[11]While Samuel Schwab did not testify that he was a shareholder of S. Schwab Company, it is assumed that Samuel Schwab was also a shareholder since family members were all shareholders. (Dkt. No. 97-6, Ps' Evid., Ex. 31, S. Schwab Depo. at 21:18-22:10.)

where the plaintiff alleged facts that the owner of the entities treated the assets of several entities as his own.  Id. at 21.  The defendant swept one of the entity's bank account every month and paid all remaining funds to himself, drained any cash that the corporation received, and although the corporation made over 10 million in profits since 2012, it had no money.  Id.  The entity had no employees or managers except the owner suggesting that he controlled the entity completely and there were also allegation that the defendant commingled the entity's funds with his funds.  Id.

Here, Plaintiffs merely assert facts to demonstrate the different roles of each corporate Defendant in the childrenswear business and present no facts of any fraudulent activity or misconduct to use the corporate structure by the individually named Defendants.  See Tomaselli v. Transamerica Ins. Co., 25 Cal. App. 4th 1269, 1285 (1994) ("Alter ego is a limited doctrine, invoked only where recognition of the corporate form would work an injustice to a third person.").

### c.   Identification of the equitable owners with the domination and control of the entities;

Plaintiffs assert that the individual Defendants had an ownership and leadership role that lead to the chain of events leading to Jesus' injury  Samuel Schwab was responsible for the day to day operations of RL Childrenswear and other Schwab entities.  Tadd Schwab oversaw global quality assurance for the Ralph Lauren Childrenswear brand.  Tadd and Samuel developed the fabric content testing protocols and Tadd was responsible for implementing those policies

"[The] mere fact of sole ownership and control does not eviscerate the separate corporate identity that is the foundation of corporate law."  Katzir's Floor & Home Design, Inc. v. M–MLS.com, 394 F.3d 1143, 1149 (9th Cir. 2004).

Here, Plaintiffs provide conclusory allegations concerning equitable owners with domination and control over the entities.  First, they have not demonstrated that any of the individual defendants are owners of the entity Defendants except for S. Schwab Company.  Next, Plaintiffs only present arguments concerning domination and control

[15cv815-GPC(MDD) ]

1   as to Samuel Schwab and Tadd Schwab, and not as to Amy Owens or Douglas Schwab.

2   Moreover, mere ownership and control does not support this factor.

3                    **d.  Personal assumption of liability on a related obligation; and**

4           Plaintiffs argue that the individual Defendants already assumed contractual

5   liability for the claims alleged in this case as they were parties to the Asset Purchase

6   Agreement between RL Childrenswear Company and Polo Ralph Lauren Corporation.

7   (Dkt. No. 97-7, Ps' Evid., Ex. 40.)  Section 10.1(c) of the Asset Purchase Agreement

8   provides that the individual defendants are responsible for certain losses, claims,

9   liabilities, and damages including those arising from litigation resulting the Schwab

10  Defendants' operation of the children's clothing business they were selling back to

11  Polo Ralph Lauren.  (Id., Ex. 40 at § 10.1(c).)  In response, Schwab Defendants argue

12  that the Agreement identifies Seller Affiliate Group solely for purposes of sections 3.5,

13  6.14, 6.15, 6.18, Article X and XII[12] and the individual Defendants were not parties to

14  section 10.1 of the Agreement.

15          The Seller Affiliate Group includes Sylvia Company, CUNY Associates, LM

16  Services, S. Schwab Company, and Samuel Schwab, Douglas Schwab, Tadd Schwab

17  and Amy Owens.  (Dkt. 80-12, Ds' Evid., Ex. 8 at 19.)

18              Subject to the limitations contained in Section 10.5, the Seller and the
                Seller Affiliate Group (collectively, the "**Seller Indemnifying**
19          **Parties**", jointly and severally, agree to indemnify, defend and hold
                harmless the Buyer (and any of its officers, directors, employees,
20          stockholders, Affiliates, successors and assigns) (the "**Buyer**
                **Indemnified Parties**") from and against any losses, claims, liabilities,
21          damages, judgments, assessments, fines, costs, expenses or deficiencies
                (including reasonable fees, expenses and disbursements of attorneys,
22          experts, personnel and consultants incurred by the party entitled to
                indemnification under this Article X), whether or not involving
23          Litigation by a third party, (collectively, "Losses") based upon, arising
                out of, due to or otherwise in respect of: . . . (c) the operation of the
24          Business at any time during the period prior to and including the
                Closing, including the operation of the Business by the Prior Licensee.
25          (as defined in the License) (other than any Loss that constitutes an
                Assumed Liability)."

26

27  _____

28      [12]The Court notes that Schwab Defendants merely cite to the Agreement without
    providing a citation to this provision in this 59 page document. (Dkt. No 80-12, Ds'
    Evid., Ex. 8.)  After a careful review, the Court was able to locate this provision.

(Id. § 10.1(c).) The indemnification provision specifically lists "Seller Affiliate Group" as part of the indemnification provision.  At the end of the document, at the top of the signatures for the Seller Affiliate it states, "For the purposes of Section 3.5, 6.14, 6.15, 6.18 and Article X and Article XII only."  However, contrary to Schwab Defendants' argument, Article X includes section 10.1 concerning indemnification.  (See id.) Therefore, the Court concludes this factor supports a unity of interest.

### e. Total absence of corporate assets

Plaintiffs argue that the Schwab entity Defendants are no longer in operation and lack any corporate assets.  Defendants reply that their arguments are based on speculation.

The absence of assets alone does not justify an alter ego determination.  Bank of Montreal v. SK Foods, LLC, 476 B.R. 588, 600 (N.D. Cal. 2012) (noting that absence of assets does not alone justify alter ego determination, the knowing transfer of assets away from potential liabilities raises concerns).  In Associated Vendors, the court noted that in almost every instance where the trial court found inadequate capitalization, other factors were present.  Associated Vendors, 210 Cal. App. 2d at 841.  It held that inadequate capitalization, itself, is not sufficient to pierce the corporate veil.  Id. at 842 ("the purpose of [piercing the corporate veil] is not protect every unsatisfied creditor, but rather to afford him protection, where some conduct amounting to bad faith makes it inequitable . . . for the equitable owner of a corporation to hide behind its corporate veil.")

Here, according to Plaintiffs, after the Purchase Asset Agreement, the Schwab entities shut down.  However, each of the entities still lists Cumberland Park, Maryland as its business address even though they no longer conduct business and Doug Schwab remains listed with the Maryland Secretary of States as the registered agent for service of process; however the entity defendants are no longer in good standing and the state of Maryland has forfeited their rights to conduct business. None of the entities have any assets.  Schwab Defendants respond that Plaintiffs' argument that the entities lack any

[15cv815-GPC(MDD)]

corporate assets is based on pure speculation because there is no evidence of lack of corporate assets at the time of the incident.[13]

Here, Plaintiffs point to no evidence that the absence of assets or inadequate capitalization was the result of any misconduct. Instead, it appears that the entities stopped operating after the Asset Purchase Agreement as they were required to halt their involvement in the Ralph Lauren childrens' clothing business. This factor does not support the unity of interest prong.

Based on a review of the factors Plaintiffs rely upon, the Court concludes that the unity of interest prong has not been met. However, even if the unity of interest factor has been met, Plaintiffs have not satisfied the second prong of "inequitable" results. See Sonora Diamond Corp., 83 Cal. App. 4th at 530 (even if there is a sufficient unity of interest, the alter ego doctrine cannot be invoked without evidence of misconduct or an injustice flowing from recognition of the separate corporate entity).

## 2. "Inequitable Result" Prong

Plaintiffs next argue that the "injustice" factor is met where the entities are insolvent leaving Jesus, a severely injured young man, with no other way to satisfy a valid judgment. Schwab Defendants allege that Plaintiffs have failed to satisfy the "injustice" element.

The "inequitable result" prong of alter ego liability addresses circumstances where "adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice." First Western Bank & Trust Co. v. Bookasta, 267 Cal. App. 2d 910, 914-15 (1968) (citations omitted); Neilson v. Union Bank of Cal., N.A., 290 F. Supp. 2d 1101, 1117 (C.D. Cal. 2003) ("California courts generally require some evidence of bad faith conduct on the part of defendants before concluding that an inequitable result justifies an alter ego finding."); Virtualmagic Asia, Inc. v. Fil–Cartoons, Inc., 99 Cal. App. 4th 228, 245

---

[13]Schwab Defendants also assert that Plaintiffs know they are insured; however, no evidence is provided to support this assertion.

[15cv815-GPC(MDD)]

1   (2002) ("[A]lter ego will not be applied absent evidence that an injustice would result
2   from the recognition of separate corporate identities, and '[d]ifficulty in enforcing a
3   judgment or collecting a debt does not satisfy this standard.")

4       As explained in <u>Associated Vendors</u>, "[c]ertainly, it is not sufficient to merely
5   show that a creditor will remain unsatisfied if the corporate veil is not pierced, and thus
6   set up such an unhappy circumstance as proof of an 'inequitable result.' In almost every
7   instance where a plaintiff has attempted to invoke the doctrine he is an unsatisfied
8   creditor. The purpose of the doctrine is not to protect every unsatisfied creditor, but
9   rather to afford him protection, where some conduct amounting to bad faith makes it
10   inequitable, under the applicable rule above cited, for the equitable owner of a
11   corporation to hide behind its corporate veil." <u>Associated Vendors</u>, 210 Cal. App. 2d
12   at 842.

13       Here, Plaintiffs' sole argument to support the "inequitable" prong is Schwab
14   Defendants' inability to compensate Jesus for his injuries based on the fact that most
15   of the entity Defendants are no longer operating or have any asserts.  However, such
16   a reason, absent any evidence of bad faith or misconduct, is not sufficient to satisfy the
17   second prong and Plaintiffs have not demonstrated a genuine issue of fact that the
18   "inequitable" prong has been met.  <u>See</u> <u>id.</u>

19       Since both factors of alter ego have not been met, the Court GRANTS Schwab
20   Defendants' motion for summary judgment as to the individual named Defendants.

21   **D.**   **Request for Judicial Notice**

22       Plaintiffs also filed a request for judicial notice of regulations of the FAA. (Dkt.
23   No. 97-8.)  The Court GRANTS Plaintiffs' request for judicial notice as unopposed.

24   **Conclusion**

25       Based on the above, the Court GRANTS in part and DENIES Schwab
26   Defendants' motion for summary judgment. The Court DENIES Schwab Defendants'
27   motion for summary on the causes of action for manufacturing defect, design defect,
28   failure to warn, negligence and breach of warranty and GRANTS Schwab Defendants'

motion for summary judgment as to the individually named Defendants.  The hearing date set for December 9, 2016 shall be **vacated**.

　　　IT IS SO ORDERED.

DATED:  December 6, 2016

HON. GONZALO P. CURIEL
United States District Judge

[15cv815-GPC(MDD) ]